# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SANTIAGO TRISTAN, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| JO ANNE B. BARNHART, | § | SA-05-CA-1223-OG (NN) |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   **Hon. Orlando Garcia**
      **United States District Judge**

## I. <u>Introduction</u>

Plaintiff Santiago Tristan seeks review and reversal of the administrative denial of his application for Supplemental Security Income (SSI) by the Administrative Law Judge (ALJ). Tristan maintains that the ALJ made errors of law in determining that he is not disabled, requiring the Court to reverse the decision of the defendant—the Commissioner of the Social Security Administration (SSA)—denying him benefits.  Tristan asks the Court to reverse the decision and to render judgment in his favor.  In the alternative, Tristan asks the Court to reverse the decision and remand the case for another hearing to fairly and properly evaluate the evidence in the record.

After considering Tristan's brief in support of his complaint,[1] the brief in support of the

---

[1] Docket entry # 12.

Commissioner's decision,[2] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the decision denying Tristan benefits, but on a basis different than one determined by the ALJ.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's applications for benefits.[3]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Tristan fully exhausted his administrative remedies prior to filing this action in federal court. Tristan filed for SSI benefits on July 29, 2002, alleging disability beginning June 22, 2002.[4] The Commissioner denied the application initially and on reconsideration.[5] Tristan then asked for a hearing.[6] A hearing was held before the ALJ on

---

[2]Docket entry # 13.

[3]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[4]SSA record, pp. 58-65. The alleged onset date is the day after Tristan reported that he was laid off from his job. *See id*. at 67.

[5]*Id*. at pp. 29-36 & pp. 37-40.

[6]*Id*. at p. 41.

December 1, 2004.[7]  During the hearing, Tristan's attorney asked for a psychological

examination.[8]  The ALJ ordered the examination and conducted a second hearing on April 19,

2005.[9]  The ALJ issued a decision on June 15, 2005, concluding that Tristan is not disabled

within the meaning of the Social Security Act (the Act).[10]  Tristan's attorney asked for review of

the decision on July 25, 2005.[11]  The SSA Appeals Council concluded on October 28, 2005 that

no basis existed for review of the ALJ's decision.[12]  The ALJ's decision became the final

decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. §

405(g).  Tristan filed this action seeking review of the Commissioner's decision on January 4,

2006.[13]

**IV.  Issue Presented**

> Is the ALJ's decision that Tristan was not under a "disability," as
> defined by the Act, at any time through the date of the decision,
> supported by substantial evidence and does the decision comport
> with relevant legal standards?

**V.  Analysis**

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

---

[7]*Id*. at pp. 256-97.

[8]*Id*. at p. 260.

[9]*Id*. at pp. 298-317.

[10]*Id*. at pp. 15-25.

[11]*Id*. at p. 11.

[12]*Id*. at p. 4.

[13]*See* Tristan's complaint, docket entry # 3.

is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[14]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[16]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[17]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[18]  Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[19]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians,

---

[14]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[15]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[16]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[17]*Martinez*, 64 F.3d at 173.

[18]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[19]*Martinez*, 64 F.3d at 174.

4

(3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[20]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[21]   The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[22]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[23]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[24]   A finding that a claimant is disabled or not disabled

---

[20]*Id.*

[21]42 U.S.C. § 1382(a)(1) & (2).

[22]42 U.S.C. § 1382c(a)(3)(A).

[23]42 U.S.C. § 1382c(a)(3)(B).

[24]20 C.F.R. §§ 404.1520 & 416.920.

at any point in the process is conclusive and terminates the Commissioner's analysis.[25]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[26]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[27]  The second step involves determining whether the claimant's impairment is severe.[28]  If it is not severe, the claimant is deemed not disabled.[29]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[30]  If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[31]  If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[32]  If the claimant is still able to do his past work, the claimant is not disabled.[33]  If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities,

_____

[25]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[26]20 C.F.R. §§ 404.1520 & 416.920.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

age, education, and work experience, to do other work.[34]  If the claimant cannot do other work, he will be found disabled.  The claimant bears the burden of proof at the first four steps of the sequential analysis.[35]  Once the claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time.[36]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.[37]

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step one, the ALJ determined that Tristan had not engaged in substantial gainful activity since his alleged onset date.[38]  At step two, the ALJ determined that Tristan was impaired by schizoaffective disorder and panic attacks.  The ALJ characterized these impairments as severe.[39]  At step three, the ALJ determined that Tristan's impairments did not meet or medically equal a listed impairment.[40]  At step four, the ALJ determined that Tristan could not perform his past

---

[34]*Id.*

[35]*Leggett*, 67 F.3d at 564.

[36]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[37]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[38]SSA record, p. 23.

[39]*Id.* at p.19.

[40]*Id.* at p. 19.

relevant work as a construction worker and laborer.[41]   The ALJ, however, found that Tristan was

capable of performing sedentary, light, or medium exertional work which involves lifting and

carrying 50 pounds occasionally and 25 pounds frequently, and capable of performing short,

simple instructional type jobs with modest contact with others, and capable of speaking English

but not capable of reading or writing in English.[42]   At step five, the ALJ considered Tristan's

age—26, educational background—seventh grade, work experience and residual functional

capacity, and determined that Tristan was capable of making a successful adjustment to work that

exists in significant numbers in the national economy.[43]   The ALJ noted that although Tristan has

the residual functional capacity to perform a significant range of medium work, his non-

exertional limitations do not allow him to perform the full range of medium work.[44]   The ALJ

concluded that Tristan is not disabled as defined in the Act.[45]

## C.  The ALJ's step one analysis

Although the ALJ determined in step one that Tristan had not engaged in substantial

gainful activity since the alleged onset date,[46] that determination is not supported by substantial

evidence.  During the first hearing, Tristan testified that he was working .  He explained that he

obtained a job through his cousin and began working on July 14, 2004—23½ months since his

---

[41]*Id*. at p. 22.

[42]*Id*. at p. 21.

[43]*Id*. at p. 23.

[44]*Id*. at p. 24.

[45]*Id*.

[46]*Id*. at p. 23.

8

alleged onset date.  Tristan testified that he earned $9.00/hour.[47]  According to his attorney, Tristan worked as a grounds man for Texstar.[48]  The attorney must have been referring to Texstar Enterprises, Inc., as the company's website states that it is  "the leading aerial and underground cable construction company in San Antonio, Texas and surrounding areas!"[49]  The following colloquy between the ALJ and Tristan about the nature of Tristan's job indicates that Tristan worked for Texstar Enterprises, Inc. as a laborer:

ALJ:        What do you do in this, in this job?

Tristan:    Well, all I have to do really is just stand by and like the foreman's [sic] call me and ask me for something and I have to throw it to him, to a bucket up there.

ALJ:        All right, so what, what are the, what are the other people doing, are they building offices, or homes, or factories or, or what?

Tristan:    Sir, they build cable.

ALJ:        Cable?

Tristan:    Cable,  sir.

ALJ:        Is it, you mean like TV cable, the cable company, that kind of thing?

Tristan:    Yes, sir.

ALJ:        Okay, and you are just handing over tools?

Tristan:    Yes, sir.

ALJ:        And you're getting paid $9.00 an hour to do that?

---

[47] *Id*. at p. 262.

[48] *Id*. at p. 260.

[49] *See* http://www.texstarenterprises.com/texstar_construction.htm.

| | |
|---|---|
| Tristan: | Yes, sir. |

\* \* \* \*

| | |
|---|---|
| ALJ: | The people who own the company aren't friends of yours or relatives of yours? |
| Tristan: | No, just the, the – |
| ALJ: | Just the, the cousin, the foreman.  Are there other people on the job who do the work that you do? |
| Tristan: | Like what do you mean, sir.  I don't know what, I'm – |
| ALJ: | Well, I mean, if I understood you, essentially, what you've been doing there is when they need a tool, or they need something, you get it for them, you give it to them? |
| Tristan: | Yes, sir. |
| ALJ: | Is that essentially what you're doing, are you doing anything beyond that? |
| Tristan: | No, sir.[50] |

Testimony by Tristan's wife about the nature of Tristan's work also indicates that Tristan worked

for Texstar Enterprises, Inc. as a laborer.  Relevant testimony follows:

| | |
|---|---|
| ALJ: | Do you understand the nature of the work he's doing now as he's discussing it? |
| Wife: | His cousin has told me it's just the tools that they use, when they ask him, you know, bring me a tool or something, give me the, the, the wires that they need, or he's used as a brake for these big, big rolls of wire, like of cable, and you know how they tell you, okay, go ahead and let them go, they put them over the poles for cable, he would like stand there and they tell him, okay, stop, so he stops and he'll hold it.  He'll hold it sometimes like a brake.  Or the tools that they need, he'll go ahead and hand them to him.  And it's usually him and his foreman, and some other guys.  His foreman is |

---

[50]SSA record, p. 262-64.

real nice with him.[51]

No evidence about employment was presented at the second hearing.  A statement in a report of

an evaluation done by a psychologist on January 17, 2005, however, indicates that Tristan may

have ceased working shortly after the hearing.[52]  In the report, the psychologist states that Tristan

had not worked in two months.[53]  Because the report is dated February 2, 2005, the statement

might constitute some evidence that Tristan ceased working shortly after the December 1, 2004,

hearing.  Because the report does not indicate the source of this information and nothing else in

the record gives any indication to the information's accuracy, I did not give the statement

controlling weight in analyzing the evidence about employment.  The analysis that follows

focuses on testimony that was given under oath before the ALJ.

The ALJ believed only part of Tristan's testimony, as evidenced by the following passage

from the ALJ's opinion:

> At the first hearing [Tristan] reported he had obtained a job through his cousin on
> July 14, 2004 and thus had been working for about 4½ months at the time of the
> hearing.  [Tristan] tried to say that he did not really work, but given his pay of
> $9.00/hour, and the fact that the company is not owned by friends or relatives, this
> testimony is rejected.  To conclude to the contrary means [Tristan] is getting a
> $360.00/week gift from strangers.
>
> [Tristan] also behaved at the first hearing as if his memory was very poor—for
> example, he could not remember prior jobs.  If this were true, [Tristan] could not
> have kept his $9.00/hour job.  Also see Exhibit 1F13 (memory seems intact),
> Exhibit R34 (concentration fair), Exhibit R35 (average intelligence with adequate

---

[51]*Id*. at pp. 280-81.

[52]*Id*. at pp. 149-57.

[53]*Id*. at p. 151.

11

recent/immediate memory.)[54]

This passage shows that the ALJ found Tristan's testimony suggesting that he really didn't work to be incredible.  Because the ALJ found this testimony to be incredible, I considered the evidence about substantial gainful activity as if that aspect of Tristan's testimony was stricken from the record.  With the evidence stricken, the evidence establishes that Tristan was working as a laborer for a cable installation company for $9.00/hour.  This work is substantial work activity because it is work activity that involves doing significant physical or mental activities—physical activity because the work requires Tristan to provide tools to a foreman working at a level higher than he is and acting as a brake to hold cable from moving, and mental because it requires recognition of tools and following the foreman's instructions.[55]  The evidence also establishes that Tristan's earnings are the result of work, not as the result of a gift or charity.  Tristan's work is gainful work activity because it is work activity done for pay or profit.[56]  Consequently, the evidence demonstrates that Tristan was engaged in substantial gainful activity.

Under the SSA regulations, a claimant will be found not disabled regardless of his medical condition or his age, education, or work experience if he is engaged in substantial gainful activity.[57]  Because the evidence shows that Tristan was engaged in substantial gainful

---

[54]*Id*. at pp. 16-17.

[55]20 C.F.R. § 416.972(a) ("Substantial work activity is work activity that involves doing significant physical or mental activities.").

[56]*Id*. at § 416.972(b) ("Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.").

[57]*Id*.

activity, substantial evidence does not support the ALJ's determination that Tristan was <u>not</u> engaged in substantial gainful activity since the alleged onset date.  As a result, the ALJ's decision should be reversed and modified to indicate that Tristan was engaged in substantial gainful activity, and thus under step one, not disabled under the Act.  Because the Court may not accept this recommendation, I will address Tristan's allegations of error which address steps two, three and four, and whether substantial evidence supports the ALJ's determinations under those steps.

**D.  Tristan's Allegations of Error**

Tristan claims that the ALJ erred in determining that he was not under a disability as defined by the Act through the date of the decision and therefore, not eligible for SSI benefits.  In particular, Tristan contends that the ALJ erred by (1) disregarding Dr. McCollum's opinion that Tristan would have marked limitations in his ability to perform mental work activities, (2) finding that Tristan's mental impairments do not meet a listed impairment,  and (3) misapplying SSA regulations in evaluating Tristan's alleged non-compliance with prescribed treatment.

**1. Did the ALJ err by disregarding Dr. McCollum's opinion that Tristan would have marked limitations in his ability to perform mental work activities?**

At step two, the ALJ found that Tristan's impairments resulted in mild restrictions of daily activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one plus episodes of decompensation, exacerbations, or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning.[58]  The ALJ did not find that Tristan's impairments resulted in marked limitations in

---

[58]SSA record, p. 19.

his ability to perform mental work activities.  Tristan maintains that the ALJ erred in this regard

and suggests that the ALJ did not follow the SSA regulations for considering medical opinions.

Although Tristan's argument is not well-developed, he seems to suggest that the results of the

ALJ's step three analysis would have been different if the ALJ had accepted all of Dr.

McCollum's opinions.  For that reason, I will consider Tristan's argument about Dr. McCollum's

evaluation as part of my analysis of the ALJ's step-three determination—a determination Tristan

challenges in his second argument.  That analysis follows.

**2. Did the ALJ err by finding that Tristan's mental impairments do not meet a listed**

**impairment?**

In step three, the ALJ must determine whether a claimant's impairment meets or

medically equals an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix

1).[59]  Tristan maintains that the ALJ erred by finding that his impairments do not meet a listed

impairment.  Tristan maintains that his impairments equal sections 12.05B and 12.05C of

Appendix 1—mental retardation.

To determine whether a claimant's impairment(s) meets or medically equals a listed

impairment, the ALJ must consider whether the impairment is "at least equal in severity and

duration to the criteria of any listed impairment."[60]  Medical equivalency can be found in the

following three ways:

> (1)(i)  If [the claimant] ha[s] an impairment that is described in the Listing of
> Impairments in appendix 1 of subpart P of part 404 of this chapter [(Appendix 1)],
> but—

---

[59]*See* 20 C.F.R. §§ 404.1520 & 416.920; 20 C.F.R. pt. 404, subpt. P., app. 1.

[60]20 C.F.R. § 416.926(a).

(A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or

(B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) [The SSA] will find that [claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the claimant's] impairment that are at least of equal medical significance to the required criteria.

(2) If [the claimant] ha[s] an impairment(s) that is not described in [Appendix 1], [the SSA] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the SSA] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.

(3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing described in [Appendix 1], [the SSA] will compare your findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the SSA] will find that [the claimant's] combination of impairments is medically equivalent to that listing.[61]

The first circumstance does not apply to Tristan because neither schizoaffective disorder nor panic attacks are listed in Appendix 1. The second circumstance applies because the ALJ determined that Tristan has impairments that are not listed in Appendix 1—*i.e.*, schizoaffective disorder and panic attacks. The Court need not consider the third circumstance as the analysis for a combination of impairments is the same as for multiple impairments under the second circumstance.

The ALJ did not explicitly compare schizoaffective disorder and panic attacks to the impairments listed in Appendix 1. Instead, the ALJ stated that he considered the necessary

---

[61]20 C.F.R. § 416.926(b).

requirements for listed impairments and determined that insufficient documentation exists to show that Tristan's impairments meet or equal a listed impairment.[62]  Because the ALJ did not reveal his analysis, I reviewed the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR)[63] to identify a closely analogous listed impairment.

The DSM-IV-TR classifies schizoaffective disorder under the classification "Schizophrenia and Other Psychotic Disorders."  The most analogous listing in Appendix 1 is "schizophrenic, paranoid and other psychotic disorders."  Those types of disorders are listed in section 12.03.  According to section 12.03, such disorders are characterized "by the onset of psychotic features with deterioration from a previous level of functioning."[64]

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
>
> > 1. Delusions or hallucinations; or
> >
> > 2. Catatonic or other grossly disorganized behavior; or
> >
> > 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
> >
> > > a. Blunt affect; or
> > > b. Flat affect; or
> > > c. Inappropriate affect;
> >
> > or

---

[62]SSA record, p. 19.

[63]Am. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (4th ed., text revision, 2000) (hereinafter DSM-IV-TR).

[64]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.03.

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[65]

The record contains scant evidence that compares to this criteria.  That evidence is summarized below.

The first evidence of any type of a mental disorder is recorded in Tristan's medical records from Metropolitan Methodist Hospital.[66]  Those records indicate that Tristan was seen at

---

[65]*Id*.

[66]SSA record, pp. 187-231.

the emergency room on July 2, 2001, complaining of anxiety and depression.[67]  A psychiatrist, Dr. Erlinda Belvis admitted Tristan.[68]  In progress notes, dated July 4, 2001, Dr. Belvis indicated that Tristan was very anxious and depressed, and that he felt he could cope better with the help of a partial hospitalization program.[69]  Although Tristan's attorney maintained during the first hearing that Tristan tried to commit suicide in June 2001, Dr. Belvis noted that Tristan was "not acutely suicidal."[70]  Dr. Belvis assessed Tristan's intellectual functioning as average and his memory as recent and immediate.[71]  Dr. Belvis diagnosed Tristan as having major depression with melancholia and panic disorder.[72]  Tristan was discharged from Metropolitan Methodist Hospital on July 4, 2001.[73]  On July 9, 2001, Dr. Belvis admitted Tristan to a partial hospital program and prescribed Paxil and Trazadone for depression.[74]  On July 12, 2001, Dr. Belvis indicated that Tristan felt depressed, anxious, and suicidal off-and-on.[75]  On July 16, 2001, Tristan told Dr. Belvis that he had started hearing voices.  Dr. Belvis changed Tristan's

---

[67]*Id*. at p. 188.

[68]*Id*. at p. 189.

[69]*Id*. at p. 189 & 196.

[70]*Id*. at p. 189.

[71]*Id*. at p. 197.

[72]*Id*. at p. 199.

[73]*Id*. at pp. 192 & 194.

[74]*Id*. at pp. 213-19.

[75]*Id*. at p. 219.

medications.[76]  On July 17, 2001, she prescribed Zoloft.[77]  On July 23, 2001, Tristan indicated to

Dr. Belvis that he was feeling more depressed and was worried about financial problems.[78]  On

August1, 2001, Tristan complained about hearing voices and Dr. Belvis prescribed Depakote.

She also changed her diagnosis to bipolar affective disorder.[79]  Tristan was discharged from the

partial hospital program on August 3, 2001.[80]  A discharge summary, dated August 3, 2001,

indicates that Tristan had been stabilized on medications.[81]

About medication, the summary indicates that Tristan had stopped taking Paxil because

he thought it gave him diarrhea, and that as a result, he had started feeling sad.[82]  Tristan was

next prescribed Seroquel, Zoloft, and Trazadone.[83]  He was later prescribed Depakote,[84] but after

complaining about side effects, he was prescribed Klonopin.[85]  At discharge, Tristan had a

diagnosis of bipolar affective disorder, mixed, and panic disorder.[86]  He was no longer considered

---

[76]*Id*. at p. 221.

[77]*Id*. at p. 216.

[78]*Id*. at p. 223.

[79]*Id*. at pp. 216 & 225.

[80]*Id*. at 230-31.

[81]*Id*.

[82]*Id*.

[83]*Id*.

[84]*Id*.

[85]*Id*.

[86]*Id*.

suicide risk.[87]   At discharge, Tristan was being treated with Zoloft, Xanax, Klonopin, and Ambien.[88]

The records from Metropolitan Methodist Hospital contain no evidence that meets or medically equals section 12.03's criteria for "schizophrenic, paranoid and other psychotic disorders" because the records contain no evidence of delusions or hallucinations; or catatonic or other grossly disorganized behavior; or incoherence, loosening of associations, illogical thinking, or poverty of content of speech—"A" criteria under section 12.03.   In addition, the records do not document a "history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. . ."[89]—"C" criteria under section 12.03.   Thus, Tristan's records from Metropolitan Methodist Hospital support the ALJ's step-three analysis because those records show that Tristan's schizoaffective disorder does not meet or medically equal the most closely analogous listed impairment.

The next evidence of mental disorder is Dr. Belvis's treatment notes for Tristan as an out-patient.[90]   Those records show that on August 9, 2001, Tristan reported to Dr. Belvis that he had stopped taking Zoloft and was feeling worse.   The notes for that day indicate that Dr. Belvis gave

---

[87]*Id.*

[88]*Id.*

[89]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.03C.

[90]SSA record, pp. 136-41.

Tristan a letter for work.[91]  Although the letter does not appear in the record, a subsequent record

entry indicates that the letter stated that Tristan was unable to work.[92]  On August 25, 2001,

Tristan reported that he was feeling somewhat better and complained about vomiting.  He stated

that he had started feeling better a week after he began to take his medications again, but that he

stopped taking his medications a week ago after he started feeling bad physically.  He

complained about not being able to afford the medications.[93]  On September 22, 2001, Tristan

complained about vomiting again and told Dr. Belvis that he had stopped taking his medications

again.  He stated that he planned to see his primary care physician about the vomiting.[94]  Dr.

Belvis saw Tristan again on November 1, 2001.  At that time, Tristan complained about vomiting

again, but had not seen a primary care physician.  Tristan also told Dr. Belvis that he thought he

would be fired from his job for saying, "I can kill someone because I have mental problems."  He

denied making the statement and said that he had been escorted from his workplace by a

policeman.[95]  When Tristan visited Dr. Belvis on January, 8, 2002, he said he was very

depressed, was having financial problems, and that his wife had left him for someone else.[96]  On

January 25, 2002, Dr. Belvis provided Tristan with a letter saying that Tristan had major

depression with melancholia and generalized anxiety disorder, and that he was disabled and

---

[91]*Id.* at p. 141.

[92]*See id.* at p. 139.

[93]*Id.* at p. 141.

[94]*Id.* at p. 141.

[95]*Id.* at p. 140.

[96]*Id.* at p. 140.

could not work.[97]  On February 6, 2002, Tristan reported having crying spells and headaches.  He

complained about being depressed.[98]  On February 21, 2002, Tristan told Dr. Belvis that he had

lost his prescription for Seroquel and that someone had stolen his medications.[99]  Dr. Belvis

provided him a prescription for Seroquel at that time.  On March 28, 2002, Tristan reported that

Seroquel calmed him down, but that it did not help him sleep.[100]  Dr. Belvis prescribed Seroquel

again.  On April 25, 2002, Tristan told Dr. Belvis that he was afraid of returning to work.  He

also told her that Seroquel helped him with his mood swings.[101]  On May 14, 2002, Tristan

reported that his depression was down, but that he still felt anxious.  He stated that wanted to go

back to work the following week.[102]  On May 30, 2002, Tristan reported that he had gone back to

work and was trying to adjust to working again.[103]  On July 1, 2002, he told Dr. Belvis that he

was let go at work.  At that time, he said he had problems with mood swings and that he had no

paranoid thinking when taking Seroquel.[104]   The final entry in Dr. Belvis treatment notes is on

August 5, 2002.  The last entry indicates that Tristan cancelled his appointment because he did

---

[97]*Id*. at p. 139.

[98]*Id*. at p. 140.

[99]*Id*. at p. 138.

[100]*Id*. at p. 138.

[101]*Id*. at p. 137-38.

[102]*Id*. at p. 137.

[103]*Id*. at p. 137.

[104]*Id*. at p. 137.

not have any money or insurance.[105]

The records from Dr. Belvis's out-patient treatment of Tristan contain no evidence that meets or medically equals section 12.03's criteria for "schizophrenic, paranoid and other psychotic disorders" because the records contain no evidence of delusions or hallucinations; or catatonic or other grossly disorganized behavior; or incoherence, loosening of associations, illogical thinking, or poverty of content of speech—"A" criteria under section 12.03.  In addition, the records do not document a "history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. . ."[106]—"C" criteria under section 12.03.[107]  Thus, Tristan's out-patient records support the ALJ's step-three analysis because those records show that Tristan's schizoaffective disorder does not meet or medically equal the most closely analogous listed impairment.

The next evidence of mental disorder is a report of a psychiatric evaluation done on October 16, 2002.[108]  Dr. Harry A. Croft conducted the evaluation.  At that time, Dr. Croft diagnosed Tristan as having schizoaffective disorder versus personality disorder with explosive

---

[105]*Id*. at p. 136.

[106]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.03C.

[107]Because section 12.03 requires the presence of "A" criterion and "B" criterion, and there is no evidence of "A" criterion, there is no reason to address evidence of "B" criterion .

[108]SSA record, pp. 131-34.

features.[109]   Under Axis II—which is used by mental health clinicians to classify personality

disorders and mental retardation[110]—Dr. Croft assessed Tristan as being educationally deprived,

but indicated that he was uncertain about Tristan's IQ.[111]   Under Axis V—which is used to assess

impairments in functioning[112]—Dr. Croft assessed Tristan as functioning at 55-60.[113]   In his

discussion, Dr. Croft opined that "psychological testing might be helpful to clarify whether there

is a schizoaffective disorder present or whether there is just a strong Axis II pathology present.

The only evidence of "A" criteria is a statement in the report that indicates Tristan said he had

delusions when he was asleep; Tristan admitted, however, that he was not sure that his delusions

during sleep were not dreams.[114]   Although this statement constitutes some evidence about "A"

criteria—delusions—it is not evidence of persistent or continuous delusions that would meet "A"

criteria.   In addition, the evaluation provides no evidence of other "A" criteria—hallucinations;

or catatonic or other grossly disorganized behavior; or incoherence, loosening of associations,

illogical thinking, or poverty of content of speech.   Dr. Croft's report contains some evidence of

"B" criteria which address restrictions in functioning.   Specifically, the evaluation contains a

global assessment-of-functioning (GAF) assessment of 55 to 60.   Under the GAF scale, an

assessment of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial

---

[109]*Id*. at p. 134.

[110]*See* DSM-IV-TR at 27.

[111]SSA record, p. 134.

[112]*See* DSM-IV-TR at 32-34.

[113]SSA record, p. 134.

[114]*Id*. at p. 132.

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[115]  Arguably, this assessment could meet "B" criteria, but evidence of "A" criteria does not exist.  Both "A" and "B" criteria are required to meet the listed impairment.  In addition, Dr. Croft's assessment does not meet "C" criteria because the assessment does not reflect that Tristan has repeated episodes of decompensation, suffers from a residual disease process, or has failed to function outside of a highly supportive living arrangement for more than one year—part of "C" criteria.  Thus, Dr. Croft's evaluation supports the ALJ's step-three analysis because the evaluation shows that Tristan's schizoaffective disorder does not meet or medically equal the closely analogous listed impairment.

The record contains additional evidence in the form of a capacity assessment, dated December 2, 2002.[116]  The assessment was done by Dr. Jim L. Cox, a licensed psychologist.  The assessment indicates that Dr. Cox specifically considered section 12.03.  Dr. Cox assessed Tristan's functioning in 20 categories, using the following scale: not significantly limited, moderately limited, markedly limited, no evidence of limitation in this category, and not ratable on available evidence.  Dr. Cox found limitation in eight categories.[117]  He assessed those categories as only moderately limited.[118]  In addressing categories of functioning listed as criteria for section 12.03—"B" criteria, Dr. Cox assessed Tristan's restrictions of activities of daily

---

[115]*See* DSM-IV-TR at 34.

[116]SSA record, pp. 114-27.

[117]*Id*. at pp. 114-15.

[118]*Id*.

25

living as mild; difficulties in maintaining social functioning as moderate; difficulties in
maintaining concentration, persistence, or pace as moderate; and episodes of decompensation,
each of extended duration as one or two.[119]  Dr. Cox opined that Tristan "should be able to
perform simple unskilled type work that does not require extensive concentration, complicated
instructions or more than minimal social interaction with co-workers or the general public."[120]
This evidence supports the ALJ's step-three analysis because it shows that Tristan's
schizoaffective disorder does not meet the severity of impairment that is required to meet or
medically equal section 12.03 because no evidence exists of the "B" criteria—that is, no evidence
of two of the following criteria: "[m]arked restriction of activities of daily living; or . . . [m]arked
difficulties in maintaining social functioning; or . . . [m]arked difficulties in maintaining
concentration, persistence, or pace or . . . [r]epeated episodes of decompensation, each of
extended duration."[121]

     The final evidence of mental disorder is a report of psychological evaluation done on
January 17, 2005, by Dr. Paul S. McCollum, a licensed psychologist.[122]  This evaluation was
requested by Tristan's attorney during the hearing on December 1, 2004.  For the evaluation, Dr.
McCollum administered the Wechsler Adult Intelligence Scale - Third Edition and reported that
Tristan scored as follows: verbal IQ - 60, performance IQ - 58, and full scale - 55.[123]  Dr.

---

[119]*Id*. at p. 128.

[120]*Id*. at p. 116.

[121]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.03(B).

[122]SSA record, pp. 149-57.

[123]*Id*. at p. 151.

McCollum stated that Tristan's full scale score fell at the lower end of the mild mental retardation range of intellectual functioning.[124]  He further stated that Tristan's verbal score was in the upper end of the mild retardation range, and that his performance score fell at the lower end of the mild retardation range.[125]  For academic achievement, Tristan scored at third grade level in reading, first grade level in spelling, and second grade level in arithmetic.[126]  Noting that these scores fall in the mental retardation range, Dr. McCollum opined that Tristan's mental status and past work history suggest that Tristan has borderline ability levels,[127] rather than mental retardation.  Dr. McCollum reported that Tristan denied having delusions or hallucinations and indicated that his depression was not severe.[128]  Dr. McCollum opined, however, that Tristan had significant depression.  Based on these opinions, Dr. McCollum diagnosed Tristan as having major depressive disorder, recurrent, moderate.  Under Axis II, he assessed Tristan as having borderline intellectual functioning (provisional).[129]

Dr. McCollum also completed a medical source statement of ability to do work-related activities (mental).[130]  Here, Dr. McCollum found moderate restrictions in the ability to "[u]nderstand and remember short, simple instructions;" moderate restrictions in the ability to

---

[124]*Id.*

[125]*Id.*

[126]*Id.*

[127]*Id.* at p. 152.

[128]*Id.*

[129]*Id.* at p. 154.

[130]*Id.* at p. 155-57.

"[c]arry out short, simple instructions;" marked restrictions in the ability to "[u]nderstand and remember detailed instructions," marked restrictions in the ability to "[c]arry out detailed instructions," and marked restrictions in "[t]he ability to make judgments on simple work-related decisions."[131]   Dr. McCollum also found moderate restrictions in Tristan's ability to "[i]nteract with the public," marked restrictions in the ability to "[i]nteract with supervisor(s)," marked restrictions in the ability to "[i]nteract appropriately with co-workers," marked restrictions in the ability to "[r]espond appropriately to work pressures in a usual work setting," and marked restrictions in the ability to "[r]espond appropriately to changes in routine work setting."[132] Although Tristan complains that the ALJ failed to consider these restrictions—apparently because the ALJ did not explicitly address these limitations in his step-three analysis—an explicit recognition of Dr. McCollum's assessments would not have changed the ALJ's analysis under section 12.03 because the limitations do not address "B" criteria—marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[133]   Dr. McCollum's assessments support the ALJ's step-three analysis because the assessments do not constitute evidence that meets or medically equals section 12.02 criteria.

Tristan, however, maintains that he meets or medically equals section 12.05—mental retardation—apparently because he satisfies criterion "B" and criterion "C" of that section.

---

[131]*Id*. at p. 155.

[132]*Id.* at p. 156.

[133]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.03B.

Criterion "B" states "[a] valid verbal, performance, or full scale IQ of 59 or less,"[134] and criterion "C" states "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[135]  Although Tristan has such scores from Dr. McCollum, no evidence exists of other requirements for mental retardation—that is, no evidence exists of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."[136]  The scores which Tristan relies on did not occur until Tristan was 25 years old,[137] and thus do not constitute evidence demonstrating or supporting the onset of mental retardation before age 22.

The ALJ also found that Tristan was impaired by panic attacks.  Appendix 1 does not list panic attacks.  According to the *DSM-IV-TR*, a "panic attack is not a codable disorder."[138]  The

---

[134]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.05B.

[135]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.05C.

[136]DSM-IV-TR at 41.

[137]*See* SSA record, p. 149 (reflecting Tristan's age at the time of Dr. McCollum's assessment).

[138]DSM-IV-TR at 432.  The *DSM-IV-TR* describes a panic attack as follows:

A discrete period of intense fear or discomfort, in which four (or more) of the following symptoms developed abruptly and reached a peak within 10 minutes:
(1) palpitations, pounding heart, or accelerated heart rate
(2) sweating
(3) trembling or shaking
(4) sensations of shortness of breath or smothering
(5) feeling of choking
(6) chest pain or discomfort
(7) nausea or abdominal distress

*DSM-IV-TR* instructs mental health clinicians to code "the specific diagnosis in which the [p]anic [a]ttack occurs." In this case, the specific diagnosis is schizoaffective disorder. My analysis of that disorder supports the ALJ's determination that Tristan's impairments do not meet or medically equal a listed impairment.

Arguably, a closely analogous impairment is "panic disorder" listed under section 12.06 which covers anxiety related disorders.

> The required level of severity for [anxiety related] disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A. Medically documented findings of at least one of the following:
>
>    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>          a. Motor tension; or
>          b. Autonomic hyperactivity; or
>          c. Apprehensive expectation; or
>          d. Vigilance and scanning; or
>
>    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>
>    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

---

(8) feeling dizzy, unsteady, lightheaded, or faint
(9) derealization (feelings of unreality) or depersonalization (being detached from oneself)
(10) fear of losing control or going crazy
(11) fear of dying
(12) paresthesias (numbing or tingling sensations)
(13) chills or hot flushes

*Id.* at 432.

30

       4. Recurrent obsessions or compulsions which are a source of marked distress; or

       5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

       1. Marked restriction of activities of daily living; or
       2. Marked difficulties in maintaining social functioning; or
       3. Marked difficulties in maintaining concentration, persistence, or pace; or
       4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.[139]

In this case, the record does not contain evidence of the "A" criterion.  The record contains scant evidence about panic attacks.  A summary of that evidence follows:  The intake notes for Tristan's admission to Metropolitan Methodist Hospital list "panic attacks" under past history.[140]  Dr. Belvis's first psychiatric evaluation indicates Tristan told her that his first severe panic attack occurred when he was 19 years old.[141]  Dr. Belvis initially diagnosed Tristan as having panic disorder.[142]  Her discharge summary from Metropolitan Methodist Hospital reflects that

---

[139]20 C.F.R. pt. 404, subpt. P., app. 1., § 12.06.

[140]SSA record, p. 188.

[141]*Id*. at p. 196.

[142]*Id*. at p. 230.

diagnosis.[143]  Later, Dr. Belvis wrote in a letter that Tristan had generalized anxiety disorder.[144]

In recording Tristan's medical history, Dr. Croft wrote that Tristan "has panic attacks when his

mind races,"[145] but did not diagnose Tristan as having panic disorder.  Instead, Dr. Croft

diagnosed Tristan as having schizoaffective disorder versus personality disorder with explosive

features.[146]  Notably, Dr. Cox made no entries under section 12.06—anxiety related disorders—in

his medical summary of his capability assessment completed on December 2, 2002.[147]  This

evidence does not rise to the level of severity required by the "A" criterion of section 12.06.

Consequently, substantial evidence supports the ALJ's determination that Tristan's panic attacks

do not meet or medically equal section 12.06.

Having determined that no evidence exists to show that Tristan meets or medically equals

a closely analogous impairment, I conclude that substantial evidence supports the ALJ's step-

three analysis.

**3. Did the ALJ err by misapplying SSA regulations in evaluating Tristan's alleged
non-compliance with prescribed treatment?**

The ALJ's opinion contains two passages about Tristan's failure to follow prescribed

treatment.  The first passage is part of the ALJ's step-two analysis.  That passage follows:

A review of the record reveals that the claimant has problems with depressive

---

[143]*Id.*

[144]*Id.* at p. 139.

[145]*Id.* at p. 132.

[146]*Id.* at p. 134.

[147]*Id.* at p. 123.

symptoms and does not take his medications properly.  When not taking his medications he naturally has greater mental problems.  In addition to these problems he worries continually about bills and how to support his family.[148]

The second passage is a parenthetical statement in the ALJ's step-four analysis.  That passage follows:

(Therefore, whatever the level of claimant's mental problems they can be reduced by taking his medications.  Claimant is clearly mentally capable of doing so.  His refusal is a choice, as perhaps a monetary issue.  Little in the way of repeated efforts to get the medicines appears in the record.)[149]

According to Tristan, these passages show that the ALJ misapplied SSA regulations.  Tristan maintains that SSA regulations require the ALJ to first conclude that a claimant would be disabled without taking into account any failure to follow prescribed treatment and then consider any alleged failure to follow prescribed treatment.  Although his argument is unclear, Tristan seems to contend that the ALJ misapplied SSA regulations because he did not determine that Tristan is disabled before considering Tristan's failure to follow prescribed treatment.

SSA regulations require a claimant to follow prescribed treatment in order to receive benefits if the treatment can restore the claimant's ability to work.[150]  The regulations further provide that the SSA will not find a claimant disabled if he does not follow the prescribed treatment without a good reason.[151]  The regulations require the ALJ to notify a claimant if he

---

[148]*Id*. at p. 17.

[149]*Id*. at p. 20.

[150]*See* 20 C.F.R. § 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work, or, if you are a child, if the treatment can reduce your functional limitations so that they are no longer marked and severe.").

[151]*See* 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled or blind or, if you are already receiving benefits, we will stop

determines a claimant has failed to follow prescribed treatment and that the failure is unjustified,[152] but the regulations do not require the ALJ to first find that the claimant is disabled. Instead, the regulations establish procedures to preclude the ALJ from determining that a claimant is not disabled based on the failure to follow prescribed treatment without giving notice. The regulations explain that notice is required to ensure a claimant understands the effect failure to follow prescribed treatment has on eligibility for benefits.[153]

Tristan, however, relies on the following regulatory statement for his position that the ALJ must first determine that a person is disabled:

> Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.[154]

Rather than require the ALJ to first determine whether a person is disabled, this statement recognizes that a person who does not follow prescribed treatment may nevertheless be found to be disabled if he has a justifiable reason not to follow prescribed treatment. This interpretation is supported by the SSA's discussion of acceptable reasons for not following prescribed

---

paying you benefits.").

[152]Adjudication, SSR 82-59: Titles II and XVI: Failure to Follow Prescribed Treatment, *available at*: http://www.ssa.gov/OP_Home/rulings/di/02/SSR82-59-di-02.html.

[153]*Id*. ("It is very important that the individual fully understand the effects of failure to follow prescribed treatment. In many cases, an adverse determination on this basis will mean that the individual will not later be able to meet the requirements for entitlement even if he or she has undergone or proposes to undergo treatment. This is because at the time when the individual agrees to follow prescribed treatment, such requirements as duration or insured status may no longer be met.") (internal citation omitted).

[154]Introduction, SSR 82-59: Titles II and XVI: Failure to Follow Prescribed Treatment, *available at*: http://www.ssa.gov/OP_Home/rulings/di/02/SSR82-59-di-02.html.

treatment.[155]  As a result, Tristan's argument fails.

Moreover, the ALJ's conclusion that Tristan is not disabled was not based on the failure to follow prescribed treatment.  Instead, the ALJ proceeded through the five-step process for determining disability.  Because the record included evidence that a treating physician had prescribed medication for Tristan's mental problems as well as evidence that Tristan had not taken medication for over one and half years, the ALJ had to consider the effect the failure to follow prescribed treatment had on Tristan's ability to work.  Despite this consideration, the ALJ's determined in step two that Tristan had two severe impairments for which treating physicians had prescribed treatment— schizoaffective disorder and panic attacks.  Tristan does

---

[155]*See* 20 C.F.R. § 416.930.  The regulations provide as follow:

> Acceptable reasons for failure to follow prescribed treatment. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:
>
> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id*. at § 416.930(c).

not challenge the ALJ's step-two determination.

What Tristan appears to challenge is the ALJ's step-four analysis because that is where the ALJ's consideration of the failure to follow treatment may have made a difference. In step four, the ALJ observed that Dr. McCollum opined that Tristan's scores on the IQ tests appeared to be more of a motivational problem than an intellectual deficiency problem.[156] The ALJ also observed that Dr. Belvis opined that Tristan had average intelligence with intact and immediate memory. Based in part on these observations, the ALJ found that Tristan's testimony about his inability to recall details about his past "not entirely credible."[157] Ultimately, the ALJ determined that Tristan retained the ability to perform short, simple instructional jobs with modest contact with others.[158] Although Tristan challenges this determination, substantial evidence supports the determination. The evidence supporting the determination is summarized below.

On July 9, 2001, Dr. Belvis assessed Tristan's intellectual functioning as average and his memory functioning as intact.[159] On October 16, 2002, Dr. Croft made the following assessment about mental status:

---

[156]The specific statement in Dr. McCollum reads as follows:

> He did not really respond in ways that were intellectually deficit but more motivationally deficient. For example, when given instructions of the Picture Completion about a missing part, he would look at the pictures and just say they were okay or he did not know. He did not make a very good effort throughout these tests.

SSA record, p. 152.

[157]SSA record, p. 21.

[158]*Id*.

[159]*Id*. at p. 213.

> His memory seemed to be intact.  He could not do simple calculations, and he had some difficulty remembering objects.  He could not abstract even the simplest of proverbs.  His insight and judgment seemed fair to poor.  His intelligence seemed that of someone with educational deprivation.[160]

Dr. Croft also assessed Tristan as functioning at 55-60 on the GAF scale.  An assessment of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[161]  On December 2, 2002, Dr. Cox made the following assessments: not significantly limited in the ability to remember locations and work-like procedures; not significantly limited in the ability to understand and remember very short and simple instructions; moderately limited in the ability to understand and remember detailed instructions; not significantly limited in the ability to carry out very short and simple instructions; moderately limited in the ability to carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods of time; not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; not significantly limited in the ability to sustain an ordinary routine without special supervision; moderately limited in the ability to work in coordination with or proximity to others without being distracted by them; and not significantly limited in the ability to make simple work-related decisions.[162]  Dr. Cox stated that Tristan's memory is intact.[163]

---

[160]*Id*. at p. 133.

[161]*See* DSM-IV-TR at 34.

[162]SSA record, p. 114.

[163]*Id*. at p. 120.

37

Dr. Cox opined that Tristan "should be able to perform simple unskilled type work that does not require extensive concentration, complicated instructions or more than minimal social interaction with co-workers or the general public."[164]  On January 17, 2005, Dr. McCollum found moderate restrictions in the ability to  "[u]nderstand and remember short, simple instructions;" moderate restrictions in the ability to "[c]arry out short, simple instructions;" marked restrictions in the ability to "[u]nderstand and remember detailed instructions," marked restrictions in the ability to "[c]arry out detailed instructions," and marked restrictions in "[t]he ability to make judgments on simple work-related decisions."[165]  Dr. McCollum also found moderate restrictions in Tristan's ability to "[i]nteract with the public," marked restrictions in the ability to "[i]nteract with supervisor(s)," marked restrictions in the ability to "[i]nteract appropriately with co-workers," marked restrictions in the ability to "[r]espond appropriately to work pressures in a usual work a setting," and marked restrictions in the ability to "[r]espond appropriately to changes in routine work setting."[166]  This evidence constitutes substantial evidence supporting the ALJ's determination that Tristan can perform simple instructional jobs with modest contact with others because all the evidence, except perhaps Dr. Croft's assessment, indicates that Tristan can follow short and simple—but not detailed—instructions and Tristan would have difficulty working with large numbers of people.  Thus, I conclude that substantial evidence exists to support the ALJ's step-four determination.

## VI.  <u>Recommendation</u>

---

[164]*Id*. at p. 116.

[165]*Id*. at p. 155.

[166]*Id.* at p. 156.

Based on the foregoing, I recommend that Tristan's request for relief (docket entry # 3) be DENIED.  My first reason for recommending that Tristan's request be denied is because substantial evidence does not support the ALJ's decision under step one that Tristan had not engaged in substantial gainful activity since the alleged onset date.  As a result, my first recommendation is to reverse the ALJ's step-one determination, modify the Commissioner's decision to find that Tristan is not disabled under step one, and affirm the decision denying Tristan's application for benefits on that basis.[167]  If the Court does not accept this recommendation, I recommend that the denial of benefits be affirmed on the alternative basis that substantial evidence supports the ALJ's step-two, step-three and step-four determinations.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[168]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the

---

[167]42 U.S.C.A. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

[168]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[169]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[170]

**SIGNED** on February 2, 2007.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[169]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[170]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).